IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jason B. Brewer, ) | |
| ) | Civil Action No. 6:14-3980-RBH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on June 9, 2011, alleging that he became unable to work on March 1, 2011. The applications were denied initially and on reconsideration by the Social Security Administration. On January 20, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Karl S. Weldon, an impartial vocational expert, appeared on January 23, 2013, considered the case *de novo*, and on May 2, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on August 21, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

(2)    The claimant has not engaged in substantial gainful activity since March 1, 2011, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: degenerative joint disease and degenerative disc disease of the lumbar spine status post decompressive surgery, fusion and instrumentation at the L5-S1, depression, anxiety and pain disorder (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). The claimant retains the ability to lift and/or carry up to 10 pounds on an occasional basis, lift and/or carry up to 5 pounds on a frequent basis, stand/walk a total of 2 hours out of an 8-hour workday, and sit for about 6 hours out of an 8-hour workday. The claimant can never climb ladders, ropes, or scaffolds. He can occasionally crawl, balance, stoop, crouch or kneel. He should avoid concentrated exposure to hazards. Furthermore, he is limited to simple, routine, repetitive tasks with only occasional changes in work settings.

2

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on March 13, 1975, and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2011, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

3

has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 35 years old on his alleged disability onset date and 38 years old on the date of the ALJ's decision. He obtained a GED and has past relevant work as a material handler, packer, construction worker, and chemical mixer.

The plaintiff initially sought treatment for lower back pain that radiated into his lower extremities in December 2007 after he was involved in a motor vehicle accident (Tr. 351). An MRI of his lumbar spine revealed spondylosis with grade I spondylolisthesis of L5-S1 and a disc bulge with foraminal narrowing (Tr. 366-67). In January 2008, the plaintiff

5

underwent a right L5 hemilaminectomy with right L4-5, L5-S1 medial facetectomy and foraminotomy (Tr. 498). The plaintiff tolerated the procedure well, but he continued to experience chronic lower back pain that radiated into his legs (Tr. 370-81, 461-63).

On April 21, 2009, the plaintiff underwent an L5-S1 decompression and instrumented arthrodesis (Tr. 412, 424). The plaintiff's condition improved, and by July 2009, he indicated that his symptoms had resolved and he was doing very well (Tr. 540). Thereafter, the plaintiff returned to work without restrictions until approximately May 2011 (Tr. 199, 559).

On May 20, 2009, State agency physician Dale Van Slooten, M.D., completed a physical residual functional capacity ("RFC") assessment (Tr. 521-28). He concluded that the plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, stand and/or walk (with normal breaks) for approximately six hours in an eight-hour day, sit (with normal breaks) for approximately six hours in an eight-hour day, and push and/or pull without limitation (Tr. 522). Dr. Van Slooten also determined that the plaintiff could frequently balance, kneel, crawl, and climb ramps or stairs, but could only occasionally stoop, crouch, or climb a ladder, rope, or scaffolding (Tr. 523). Dr. Van Slooten concluded that the plaintiff had no manipulative, visual, communicative, or environmental limitations (Tr. 524-25).

On April 24, 2011, the plaintiff presented to the emergency room for an exacerbation of his back pain, but acknowledged that he had been without medical coverage for one month and, thus, had not taken his medication. The plaintiff indicated that he had been doing well prior to running out of medication. The attending physician provided the plaintiff with a one-week supply of pain medication and advised him to follow up with a pain management specialist (Tr. 595-97).

On May 4, 2011, Ron DeGarmo, M.D., the plaintiff's primary care physician, evaluated the plaintiff for follow-up of pain and medication refills. The plaintiff requested a referral to a neurosurgeon for his back problems. Dr. DeGarmo noted lumbar pain and

6

spasms. He prescribed Lortab 10, Soma, Cymbalta, and Ativan. Dr. DeGarmo referred the plaintiff to Stephen R. Gardner, M.D., the physician who performed the plaintiff's first back surgery (Tr. 575).

On June 23, 2011, Dr. DeGarmo completed a mental questionnaire indicating that the plaintiff had anxiety, depression, and pain. He indicated that the plaintiff was being treated with Cymbalta and Ativan, which had helped his condition. Dr. DeGarmo indicated that he had not referred the plaintiff for psychiatric care. Dr. DeGarmo found the plaintiff was appropriately oriented; had a slowed and distractible thought process; had suspicious and obsessive thought content; worried, anxious, flat, and depressed mood and affect; and adequate attention, concentration, and memory. When Dr. DeGarmo was asked whether the plaintiff had mental impairments, he responded that the plaintiff's mental conditions caused slight work-related limitation of function (Tr. 529).

The plaintiff returned to the emergency room on July 19, 2011, reporting increased lower back pain after moving furniture (Tr. 598). On physical examination, the plaintiff had paraspinal tenderness, but negative straight leg raising test and no motor deficits (Tr. 600). Attending physicians assessed the plaintiff with back pain with radiculopathy and discharged him home in stable condition (Tr. 600-01).

On July 25, 2011, the plaintiff saw Joyce Cook, N.P., Dr. Gardner's nurse practitioner, and reported increased lower back pain with radiation into his legs that was not responding to medication (Tr. 536). He rated this pain at a seven out of ten. The plaintiff stated that his back pain was recently aggravated because he was in the process of moving (*id.*). In addition, the plaintiff reported that his symptoms were worse with heavy lifting and standing, but he did not have any standing or walking intolerance (*id.*). On examination, the plaintiff had mid-line and sciatic notch tenderness, reduced lumbar range of motion, decreased sensation in his left foot, and positive straight leg-raising test (Tr. 537-38). However, the plaintiff remained capable of toe and heel walking, he had a normal gait, and

he had no loss of strength (Tr. 538). In addition, an x-ray of his lumbar spine showed no acute bony abnormalities, hardware and bone graft intact and in good position, no instability at any level on flexion or extension views, and mild diffuse degenerative changes to L4-5 (Tr. 532).  Ms. Cook assessed the plaintiff with acquired spondylolisthesis, ordered a CT myelogram for further evaluation, and released him back to work on modified duty (Tr. 538).

On July 27, 2011, Dr. DeGarmo evaluated the plaintiff for back pain and spasms.  Dr. DeGarmo noted that the plaintiff had a rod in his back and refilled the plaintiff's medications including Lortab, Soma, Cymbalta, and Ativan (Tr. 574).  On August 11, 2011, Dr. DeGarmo evaluated the plaintiff for low back pain and depression.  Dr. DeGarmo indicated that he was also going to complete insurance forms regarding the plaintiff (Tr. 572-73).

On September 9, 2011, Bruce A. Kofoed, M.D., performed a psychological evaluation of the plaintiff at the Commissioner's request.  The plaintiff reported chronic back pain beginning with a motor vehicle accident in 2007 and resulting in two back surgeries. The plaintiff also reported numbness, bladder incontinence, decreased sexual functioning, frustration, and depression related to coping with his pain issues.  Dr. Kofoed elicited the plaintiff's history and noted that he had been out of work completely since May 2011.  Dr. Kofoed indicated that the plaintiff was cooperative during the interview.  The plaintiff's mood was sad, and he admitted to being quite frustrated and having poor sleep.  Dr. Kofoed noted that the plaintiff's pain had often awakened him at night and that the plaintiff often worried about his life situation.  Dr. Kofoed indicated that the plaintiff put forth good effort on cognitive tasks and was appropriately oriented.  The plaintiff was able to recall items immediately on the Rey 15-Item test and had no problems with serial 7s.  Dr. Kofoed stated that the plaintiff's primary complaints revolved around his chronic back pain and that he would defer to medical evaluations for discussions of the plaintiff's pain issues.  Dr. Kofoed estimated that the plaintiff functioned at a high average range of intellect with good

8

arithmetic skills and intact recall skills.  Dr. Kofoed indicated that the plaintiff showed good social interaction.  Dr. Kofoed opined that the plaintiff would likely do poorly in hectic, time-pressured environments and that the plaintiff's physical endurance over the course of a workday might tend to be poor due to his pain issues.  Dr. Kofoed's diagnostic impressions were pain disorder with psychological factors and a medical condition and chronic back pain.  Dr. Kofoed also indicated that the plaintiff appeared capable of managing his own funds independently (Tr. 559-61).

A Psychiatric Review Technique Questionnaire form was completed by Larry Clanton, Ph.D., a non-examining doctor on contract to the Administration, on September 16, 2011, indicating that the plaintiff had medically determinable mental impairments causing mild restriction of daily activities, mild difficulty in maintaining social functioning, moderate difficulty in maintaining concentration, persistence, and pace, and no episodes of decompensation (Tr. 95-96).

On September 26, 2011, Hugh Clark, M.D., a State agency physician, reviewed the evidence in connection with the plaintiff's application.  Dr. Clark opined that the plaintiff could perform a limited range of light work (Tr. 96-98).

On October 18, 2011, Dr. DeGarmo evaluated the plaintiff and noted that he was in a recent motor vehicle accident.  Dr. DeGarmo refilled the plaintiff's medications including Lortab 10 (Tr. 569).  Dr. DeGarmo's treatment notes document reports of lower back pain and muscle spasm, but consistently indicate normal neck, musculoskeletal, and neurological examinations (Tr. 567, 569-71, 583).  In a check-box form completed on November 1, 2011, Dr. DeGarmo opined that the plaintiff retained the capacity to lift and/or carry 20 pounds occasionally and less than ten pounds frequently; stand/walk three hours in an eight-hour workday, but for only 30 minutes at one time; and sit two-to-three hours in an eight-hour workday, but for only 30 minutes at one time (Tr. 563-64).  Dr. DeGarmo also stated that the plaintiff could occasionally climb, balance, and stoop, but never crouch,

9

kneel, or crawl (Tr. 564). Finally, Dr. DeGarmo contended that the plaintiff had reaching, feeling, pushing, and pulling limitations, and he needed to avoid heights, moving machinery, temperature extremes, and vibration. Dr. DeGarmo stated that the plaintiff's limitations would normally be expected from the type and severity of his diagnoses, that objective findings confirmed the plaintiff's diagnoses, and that he was not basing his opinions primarily on the plaintiff's subjective complaints (Tr. 563-65).

A Psychiatric Review Technique Questionnaire form was completed by Debra C. Price, Ph.D., a non-examining doctor on contract to the Administration, on December 9, 2011. Dr. Price indicated that the plaintiff had medically determinable mental impairments causing mild restriction of daily activities, mild difficulty in maintaining social functioning, moderate difficulty in maintaining concentration, persistence, and pace, and no episodes of decompensation (Tr. 126-27).

On December 12, 2011, Carl Anderson, M.D., a State agency physician, reviewed the record and concluded that the plaintiff could perform a limited range of light work that included lifting and carrying 20 pounds occasionally and ten pounds frequently, standing/walking about six hours in an eight hour workday, and sitting about six hours in an eight hour workday. Dr. Anderson indicated that the plaintiff could frequently kneel and climb ramps and stairs; and, could occasionally perform all other postural abilities. Dr. Anderson also indicated that the plaintiff would need to avoid even moderate exposure to hazards (Tr. 128-30).

On January 16, 2012, Dr. DeGarmo evaluated the plaintiff. The plaintiff complained of leg weakness and reported falls and his leg giving out. Dr. DeGarmo noted cervical and lumbar pain and spasms. Dr. DeGarmo refilled the plaintiff's medications including Lortab 10 (Tr. 568). On February 15, 2012, Dr. DeGarmo evaluated the plaintiff and reviewed his blood work (Tr. 570). On March 8, 2012, Dr. DeGarmo refilled the plaintiff's prescriptions for Ativan, Lortab 10, Soma, and Cymbalta (Tr. 567). On April 21,

2012, Dr. DeGarmo evaluated the plaintiff and refilled his medications for low back pain, anxiety, and depression (Tr. 566).

The plaintiff returned to the emergency room on August 29, 2012, with complaints of increased lower back pain that radiated into his legs (Tr. 604).  The plaintiff denied bowel incontinence, and his physical examination revealed no paraspinal tenderness, no focal motor deficits, and normal range of motion in his lower extremities (Tr. 606).  The plaintiff's back pain improved with a Dilaudid injection, and attending physicians discharged him in stable condition (*id.*). He was prescribed prednisone and advised to follow-up with his neurosurgeon (Tr. 602-08).

On September 10, 2012, Dr. DeGarmo evaluated the plaintiff and refilled his medications, including Lortab 10.

On February 12, 2013, Patrick B. Mullen, M.D., performed a psychiatric evaluation of the plaintiff at his attorney's request.  The plaintiff reported suffering from mild depression on and off for ten to fifteen years.  Dr. Mullen noted the plaintiff's 2007 motor vehicle accident, which required two surgeries and caused chronic pain that eventually left him unable to work in 2011.  Tthe plaintiff reported chronic pain, numbness, and difficulty sleeping, which worsened after he lost his job.  The plaintiff indicated that his gait was uncertain, and he had fallen on several occasions.  The plaintiff indicated that his pain wakes him from sleep and is exacerbated by any activity. Dr. Mullen noted that the plaintiff had ruminative thoughts and stayed worried and hopeless.  The plaintiff's depressive symptoms also included crying spells, weight loss, decreased libido.  Dr. Mullen indicated that the plaintiff also had anxiety symptoms including skipping of his heartbeat, numbness in parts of his body, hot flashes, irritability, nervousness, restlessness, tension, and chest tightness.  The plaintiff reported getting tired and weak very easily.  The plaintiff indicated that he needed a myelogram for new symptoms with his back, but he was unable to pursue this treatment due to a lack of funds.  Dr. Mullen found the plaintiff's had slow psychomotor

11

speed and a very depressed affect.  Dr. Mullen indicated that the plaintiff's memory appeared to be intact, but it appeared that the plaintiff found it hard to think about things other than his pain and sorrow.  Dr. Mullen reviewed various medical records, which corroborated the plaintiff's history.  Dr. Mullen gave the plaintiff self-assessments which showed a significant score in the depression scale.  The plaintiff's pain scale indicated that his pain was usually a six out of ten, and he got little relief from the pain medications Lortab and Soma.  Dr. Mullen diagnosed chronic pain disorder; depression, major, moderate to severe; generalized anxiety and a Global Assessment of Functioning ("GAF") score of 45.[2] Dr. Mullen explained that in addition to the psychosocial reasons for the plaintiff's depression, his chronic back pain was also a biological reason causing depression.  Dr. Mullen stated, "If all he suffered was the pain, I am afraid he would try to soldier on and work despite the risks of re-injury and paralysis that he ran or would run.  His back is a total wreck and he should never work again because of his back pain and instability."  Dr. Mullen also stated, "He is not a candidate for the active work force in any capacity and all of this is substantiated by his medical records and his psychiatric interview" (Tr. 611-14).

On February 12, 2013, Dr. Mullen also completed a medical opinion form regarding the plaintiff.  He indicated that in the mental abilities and aptitudes needed to do unskilled work the plaintiff was limited but satisfactory in his abilities to understand and remember very short and simple instructions; to carry out very short and simple instructions cognitively; to ask simple questions or request assistance; and to accept instructions and respond appropriately to criticism from supervisors.  Dr. Mullen indicated that the plaintiff was seriously limited but not precluded from his abilities to remember work-like procedures

---

[2] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See*  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF schore between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

and to be aware of normal hazards and take appropriate precautions.  Dr. Mullen also indicated that the plaintiff was unable to meet competitive standards in his abilities to maintain attention for two hour segments; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. Dr. Mullen indicated that the plaintiff had no useful ability to function in the abilities to maintain regular attendance and be punctual within customary, usually strict tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; or deal with normal work stress (Tr. 609-10).

Dr. Mullen indicated that the plaintiff was unable to meet competitive standards in understanding and remembering detailed instructions, in carrying out detailed instructions, and in setting realistic goals or making plans independently of others.  He indicated that the plaintiff had no useful ability to function in dealing with the stress of semiskilled and skilled work.  Dr. Mullen also indicated that the plaintiff was seriously limited, but not precluded from interacting appropriately with the general public and in traveling in unfamiliar places; and, that the plaintiff was unable to meet competitive standards in maintaining socially appropriate behavior, in adhering to basic standards of neatness and cleanliness, and in using public transportation. Dr. Mullen explained that the plaintiff also had back failure in addition to depression.  Dr. Mullen estimated that the plaintiff's impairments and treatment would cause him to miss more than four days of work per month if he attempted to work (Tr. 609-10).

On February 14, 2013, the plaintiff saw Susan Tankersley, M.D., for a consultative examination (Tr. 615).   The plaintiff alleged disability due to lumbar degenerative disc disease that radiated into his legs and reported some urinary

13

incontinence (Tr. 616).  On physical examination, the plaintiff had an antalgic gait and ambulated with a cane (Tr. 617).  Examination of his upper extremities was unremarkable except for decreased shoulder range of motion secondary to back pain (*id*.).  The plaintiff had slightly decreased strength and range of motion in his left leg, but his right leg was normal (Tr. 618).  In addition, the plaintiff had some loss of cervical and lumbar spine lordosis, tenderness on palpation throughout his spine, decreased lumbar range of motion, and a positive straight leg raising test (*id*.).  He had sacroiliac ("SI") joint pain bilaterally in addition to some posterior superior iliac spine ("PSIS") tenderness on the right.  The plaintiff indicated that he was unable to feel anything along his left PSIS or mid-gluteally on the left. His lumbar spine range of motion was reduced on forward flexion to 40 degrees, extension was 20 degrees, side flexion 10 degrees left and 15 degrees right.  Dr. Tankersley's impressions were history of degenerative joint disease, degenerative disk disease of lumbar spine, status post decompressive surgery x2, posterior fusion with instrumentation at L5-S 1 level, chronic lower back pain, probable ongoing left radiculopathy, intermittent cauda equina type symptoms; possible onset osteoarthritis bilateral knees, internal derangement left knee; and history of anxiety.  Dr. Tankersley stated, "He does look to have a significant left radiculopathy on physical exam.  Definitive diagnosis, of course, will require MRI or CT myelogram and/or electrodiagnostic studies."  She also stated, "My general feeling is that his employment will be limited to the sedentary at very best.  His ongoing back pain may prevent even this."  Dr. Tankersley also cautioned the plaintiff about the potential significance of cauda equina syndrome and its consequences and urged him to seek care for this if his symptoms persisted (Tr. 615-22).

Dr. Tankersley also completed a medical source statement on February 14, 2013, in which she opined that the plaintiff could perform no more than sedentary exertional work (Tr. 619, 623-28).  Specifically, Dr. Tankersley noted that the plaintiff could occasionally lift up to 50 pounds and could never lift over 50 pounds,  and the plaintiff could

14

occasionally carry up to ten pounds, but never carry over ten pounds.  Dr. Tankersley indicated that the plaintiff could sit, stand, and walk each for 30 minutes at one time without interruption. She indicated that the plaintiff could sit for three hours total in an eight-hour day and could stand and walk each for two hours total in an eight-hour day.  Dr. Tankersley indicated that the plaintiff required a cane to ambulate and estimated that the plaintiff could ambulate 50 to 100 yards without his cane.  She indicated that the cane was necessary for fall prevention and that while using a cane the plaintiff could carry small objects with his free hand.   Dr. Tankersley indicated that the plaintiff could occasionally use his hands for reaching, handling, fingering, and feeling, but could never use either hand for pushing or pulling.  She noted that the plaintiff was right-hand dominant.  Dr. Tankersley indicated that the plaintiff could occasionally use his right foot for operation of foot controls and could use his left foot between never and occasionally for operation of foot controls. The plaintiff could occasionally balance and could never, climb, stoop, kneel, crouch, or crawl.  Dr. Tankersley stated that the plaintiff could occasionally tolerate operating a motor vehicle; humidity and wetness; dust, odors, fumes, and pulmonary irritants; and extreme heat.  She indicated that the plaintiff could never tolerate unprotected heights, moving mechanical parts, extreme cold, and vibration.   Dr. Tankersley also indicated that the plaintiff could participate in various activities except he could not walk a block at a reasonable pace on rough or uneven surfaces (Tr. 623-28).

The plaintiff submitted certain evidence for the first time to the Appeals Council consisting of the following:

1) A one page questionnaire completed by Carol Kooistra, M.D., dated July 31, 2013, indicating that the plaintiff would need to rest for more than one hour during an eight-hour workday, would miss more than three days of work per month, and would have problems with attention and concentration sufficient to frequently interrupt tasks during the workday.  Dr. Kooistra indicated that the diagnosis underlying these limitations was failed

15

back syndrome status post L4-5 and L5-S1 discectomy 2008 and fusion 2009. Dr. Kooistra based her opinions on the plaintiff's history, examination, and a review of records. Dr. Kooistra stated that the plaintiff's condition probably persisted at this level of severity since "2011 at least" (Tr. 629).

2) A December 2013 lumbar spine MRI showing postsurgical changes at L5-S1 with bilateral pedicle fixation screws in place; L5 laminectomies and spinous process removal evident with patent thecal sac and no evidence of central canal stenosis; postoperative fibrosis on the left side posterior to a left-sided dominant graft; mild fibrosis surrounding the left S1 nerve root, but no recurrent disc herniations; and L4-5 facet arthropathy and mild hypertrophy with a mild degree of triangulation of the spinal canal and thecal sac, but no significant stenosis or compressive discopathy (Tr. 630).

3) A statement from Dr. DeGarmo dated May 5, 2014, summarizing the plaintiff's treatment history since 2003 and indicating that his back impairment would preclude any type of full time work (Tr. 632). Dr. DeGarmo also retracted his previous statement that the plaintiff's attention and concentration were adequate (*id*.). Dr. DeGarmo now contended that the plaintiff would be unable to maintain a production pace at a simple sit down job due to frequent interruptions to concentration from chronic pain and fatigue (*id.*). Dr. DeGarmo stated, "I misunderstood that questionnaire. It was my understanding that questionnaire was only referring to the limitations of function the plaintiff would experience due to his mental health issues alone." Dr. DeGarmo stated, "I have observed him to suffer frequent interruptions to concentration from his pain in my office. His fatigue contributes to this problem. He is unable to sleep well due to a combination of pain and his depression." Dr. DeGarmo opined that the plaintiff "would be in too much pain to be able to concentrate enough to maintain a production pace even at a simple sit down job due to frequent interruptions to his concentration from chronic pain and fatigue. His depression would contribute to this problem." Dr. DeGarmo explained that it was possible that the

plaintiff's condition could improve to the point where he could return to work if he had access to the proper treatment.    Dr. DeGarmo stated, "If the plaintiff's financial circumstances were not an issue, we could refer him for another course of physical therapy and perhaps refer him to an orthopedic surgeon.  We have no way of knowing if these options would improve his condition."  Dr. DeGarmo also stated that the plaintiff presented as credible and had been compliant as he can be given his financial limitations" (Tr. 632-33).

### Administrative Hearing Testimony

At the hearing, the plaintiff explained that his back and leg pain were the primary impairments preventing him from working (Tr. 65).  He indicated that he used an assistive device when walking and estimated that he could walk only a few steps and lift no more than a gallon of milk (Tr. 66). The plaintiff also alleged depression and anxiety for which his primary care physician prescribes psychotropic medication (*id.*).  He has not sought treatment from a mental health professional (*id.*).  In addition, the plaintiff alleged that he had "pretty severe" incontinence, but acknowledged that he had not sought any treatment (Tr. 67-68).  The plaintiff stated that he maintains a driver's license, but he does not drive often (Tr. 68).  The plaintiff stated that he does not perform household chores or shop in stores (*id.*).

After identifying the plaintiff's past relevant work, the ALJ asked the vocational expert the following hypothetical:

> Suppose we have a hypothetical individual with the claimant's age, education and past work experience [w]ho is restricted to light work activity as defined in the Dictionary of Occupational Titles and Social Security regulations. Can never use a ladder, rope or scaffold. Could only occasionally crawl, balance, stoop, crouch, or kneel. Who must avoid concentrated exposure to hazards, and is limited to simple, routine and repetitive tasks with no ongoing public interaction, and low stress defined as only occasional changes in the work setting or decision-making. Could such an individual return to past relevant work? And if

17

> not, could he return to other forms of work activity existing in significant numbers in the local or several regions of the national economy?

(Tr. 81).  The vocational expert indicated that this hypothetical would preclude the plaintiff's past relevant work, but would allow for "light unskilled work" such as a hand packager or box inspector (Tr. 81-82).  The ALJ then changed the category from light to sedentary, and the vocational expert indicated that this would allow for sedentary unskilled work such as a winder, a sorter, and an inspector (Tr. 82).  The ALJ's next hypothetical included a limitation due to severe mental impairments that would require the person to "miss at least a minimum of 3 or more workdays a month" (*id*.).  The vocational expert indicated that this would preclude all jobs stating, "Three absences per month would not be tolerated by any employer" (*id*.)

The plaintiff's attorney asked the vocational expert to assume, based on Dr. DeGarmo's November 2011 opinion, the following hypothetical:

> [A] person of like education, age, work history. Lift 20 pounds occasionally, less than ten pounds frequently. Sit for two to three hours, 30 minutes without interruption. Stand, walk three hours, 30 minutes without interruption. Occasional climb, balance, stoop. Never crawl, kneel or crouch. Limitations with overhead reaching. Push/pull limitations same as lift. Should avoid heights, moving machinery, vibration and temperature extremes. Would there be any jobs in the national economy that would fit that description?

(Tr. 84).  The vocational expert responded that there "would be no jobs" (*id*.).

## **ANALYSIS**

The plaintiff argues that (1) the ALJ erred by giving little weight to portions of Dr. DeGarmo's opinions that supported a finding of disability, and (2) the case should be remanded for consideration of new evidence presented to the Appeals Council.

18

***Treating Physician***

            The plaintiff first argues that the ALJ failed to give proper weight to the opinions of treating physician Dr. DeGarmo (pl. brief 19-30; pl. reply 1-9).  The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

            The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

19

*Id.* at *4.

On November 1, 2011, Dr. DeGarmo opined that the plaintiff retained the capacity to lift and/or carry 20 pounds occasionally and less than ten pounds frequently; stand/walk three hours in an eight-hour workday, but for only 30 minutes at one time; and sit two-to-three hours in an eight-hour workday, but for only 30 minutes at one time (Tr. 563-64). Dr. DeGarmo also stated that the plaintiff could occasionally climb, balance, and stoop, but never crouch, kneel, or crawl (Tr. 564). Finally, Dr. DeGarmo contended that the plaintiff had reaching, feeling, pushing, and pulling limitations, and he needed to avoid heights, moving machinery, temperature extremes, and vibration. Dr. DeGarmo stated that the plaintiff's limitations would normally be expected from the type and severity of his diagnoses, that objective findings confirmed the plaintiff's diagnoses, and that he was not basing his opinions primarily on the plaintiff's subjective complaints (Tr. 563-65).

The ALJ afforded "some weight" to Dr. DeGarmo's opinion stating:

> I have also attributed some weight to the findings of treating physician Dr. DeGarmo, whose findings, in part, are consistent with the opinions of the State agency consultants. Dr. DeGarmo completed an RFC assessment of the claimant on November 1, 2011. He concluded that the claimant could lift and/or carry up to 20 pounds occasionally and 10 pounds frequently. The claimant could stand and/or walk up to 3 hours in an 8-hour workday. The remainder of Dr. DeGarmo's assessment contradicts some of the State agency findings and the above RFC. He opines that the claimant could sit up to 3 hours in an 8-hour workday. The claimant could occasionally climb, balance, stoop but never crouch, kneel or crawl. The claimant would have limitations reaching, handling and pushing/pulling (Exhibit l4F). I attribute limited weight to these findings as they are inconsistent with the weight of the medical evidence as documented above.

(Tr. 31).

The plaintiff argues that the ALJ's general statement that the opinion was inconsistent with the medical evidence is insufficient to support the rejection of Dr.

20

DeGarmo's opinion, the ALJ improperly rejected evidence that supported the opinion, evidence dated prior to the alleged onset date cannot be used to support the rejection of the opinion, the mental consultative examination reports do not support the rejection of the opinion, and the ALJ erred in assigning great weight to the opinions of non-examining State agency doctors who did not have the complete record before them.

As noted by the plaintiff, the ALJ did not acknowledge that the limitations offered by Dr. DeGarmo were largely consistent with those limitations imposed by Dr. Tankersley.  At the hearing on January 23, 2013, the ALJ indicated that an orthopedic consultative evaluation should have been done by the Commissioner and was needed before he made his decision (Tr. 84). This examination was performed by Dr. Tankersley on February 14, 2013 (Tr. 615-22).  As set forth more fully above, Dr. Tankersley completed a medical source statement in which she opined that the plaintiff could sit, stand, and walk each for 30 minutes at one time without interruption and could sit for three hours total in an eight-hour day and could stand and walk each for two hours total in an eight-hour day.  She stated that the plaintiff required a cane to ambulate and estimated that he could ambulate 50 to 100 yards without his cane.  Dr. Tankersley indicated that the plaintiff could occasionally use his hands for reaching, handling, fingering, and feeling, but could never use either hand for pushing or pulling, and further indicated that the plaintiff could occasionally use his right foot for operation of foot controls and could use his left foot between never and occasionally for operation of foot controls. The plaintiff could occasionally balance and could never, climb, stoop, kneel, crouch, or crawl (Tr. 623-28).

The ALJ gave Dr. Tankersley's opinion "some weight" but attributed "limited weight" to her findings that were inconsistent with the residual functional capacity ("RFC") determination (Tr. 31).  Specifically, the ALJ gave limited weight to Dr. Tankersley's findings that the plaintiff could sit for only three hours per day, would require an assistive device to ambulate, was limited to occasional reaching, handling, fingering, and feeling and

21

occasional operation of foot controls, and no climbing, stooping, kneeling, crouching, or crawling (Tr. 310). These findings were consistent with those of Dr. DeGarmo, but were rejected by the ALJ as "inconsistent with the weight of the medical evidence as documented above" (Tr. 31).

Furthermore, as argued by the plaintiff, the ALJ appears to have relied on evidence from prior to the plaintiff's alleged onset date (pl. brief at 27). Specifically, the ALJ noted that the plaintiff did well in the months following his back surgery in April 2009 (Tr. 30). However, the plaintiff did not allege disability until March 2011, and he testified that he returned to work following his surgery and was able to work with his pain until he fell in 2011 (Tr. 70). This is consistent with the record that shows the plaintiff sought emergency room treatment in April 2011 for increased back pain and requested a referral to his neurosurgeon for increased symptoms in May 2011 (Tr. 594-95). While the Commissioner is correct that evidence prior to the alleged disability onset date may be relevant to provide a longitudinal history of the plaintiff's back impairment (def. brief at 13), the ALJ specifically cited the 2009 evidence to support the finding that "the weight of the objective medical evidence does not support the [plaintiff's] allegations of disabling impairments and or symptoms" (Tr. 30). Moreover, the ALJ apparently relied on this same evidence in giving Dr. DeGarmo and Dr. Tankersley's findings "limited weight" (Tr. 31 (finding that the opinions are "inconsistent with the weight of the medical evidence as documented above)).

The Commissioner argues that "the fact that the ALJ considered the plaintiff's medical evidence relating to his back impairment for a larger period of time during the disability adjudication *benefitted* Plaintiff. Indeed, because the ALJ, in adjudicating this claim, reviewed all evidence relating to Plaintiff's claim, the ALJ *could have found* that evidence pre-dating his alleged onset date provided substantial support for Dr. DeGarmo's opinion" (def. brief at 13) (emphasis added). However, this argument is of no consequence

22

as the ALJ did not find that the pre-alleged onset date evidence supported Dr. DeGarmo's opinions.

The Commissioner argues that the ALJ limited the weight given to Dr. DeGarmo's opinion "because it was not supported by the treatment notes from 2011 and 2012, which showed no standing or walking intolerance, unremarkable radiographic imaging, and control of pain symptoms with medication" (def. brief at 13-14). The ALJ did note that the plaintiff denied any standing or walking intolerance in July 2011 (Tr. 30), but the remainder of this argument is *post hoc* rationale not offered by the ALJ in evaluating Dr. DeGarmo's opinion. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). The Commissioner further states that Dr. DeGarmo's opinion was "inconsistent with his clinical notes, which consistently revealed normal neck, a normal gait, and no loss of strength or neurological abnormalities" (def. brief at 11). Again, this is *post hoc* rationale not offered by the ALJ (def. brief at 11) as the ALJ did not indicate that Dr. DeGarmo's opinion was contradictory to his treatment notes.

The plaintiff further argues that the ALJ erroneously assigned "significant weight" to the opinions of the non-examining State agency physicians even though they were based on a partial record (pl. brief at 8-9; *see* Tr. 30-31). The ALJ stated as follows:

> In reaching the above physical RFC limitations, I have also attributed significant weight to the findings of the State agency medical consultants, whose opinions are consistent with the evidence reiterated above. On May 20, 2009, Dale Van Slooten, M.D., performed a State agency RFC assessment of the claimant. He found the claimant capable of performing light work with occasional climbing ladders/ropes/scaffolds, stooping and crouching and frequent climbing ramps/stairs, balancing, kneeling and crawling (Exhibit 9F). More recent RFC assessments of Hugh Clark, M.D. and Carl Anderson, M.D., also find the claimant to have the residual functional capacity
to perform light work. They found the claimant's postural activities to be limited to

occasional with the exception of kneeling and climbing ramps/stairs, which they limited to frequent. They also noted that the claimant should avoid even moderate exposure to hazards (Exhibit 5A and 9A).

(Tr. 30-31).  As noted by the plaintiff, Dr. Anderson was the only reviewer to have the benefit of Dr. DeGarmo's opinions, and none of the reviewers had the benefit of reviewing Dr. Tankersley's consistent findings from the examination that the ALJ himself stated was needed for his decision (Tr. 84).  In *Rogers v. Colvin*, No. 0:12-2210-MGL, 2014 WL 1330088 (D.S.C. March 31, 2014), the court ordered remand in a similar situation, finding:

> Here, perhaps most notable about the ALJ's evaluation is that he gave greater weight to the opinions of nonexamining sources rather than Plaintiff's treating sources. *See* 20 C.F.R. §§ 404.1527(d) (1), (2) (stating that generally more weight is given to the opinions of an examining source, than a nonexamining source, and to sources with a treating relationship with the claimant); 416.927(d) (1), (2) (same). And he did so, when the nonexamining sources did not have the benefit of subsequent opinions from treating and examining sources. While under appropriate circumstances the opinions of nonexamining sources may be given more weight than those of treating sources, *see* SSR. 96–6p, 1996 WL 374180, at *3 (2 July 1996), the ALJ fails to show that such circumstances are present here.
>
> As it appears, the nonexamining sources, did not have the benefit of all the medical opinions prior to issuing their opinions, the court is unable to discern from the present record whether the ALJ's decision is supported by substantial evidence. Accordingly, due to the unique circumstances of this case, the court is constrained to remand this matter to the Commissioner for further proceedings. The Commissioner is directed to submit the subsequent opinions from treating and examining sources to the nonexamining sources for further consideration. The court acknowledges that this may not alter the opinions of the nonexamining physicians.

*Id.* at *3-4.  Consideration of Dr. Tankersley's consistent opinion appears to be particularly important here as State agency physician Dr. Anderson rejected Dr. DeGarmo's findings in part because Dr. DeGarmo was not a specialist (Tr. 130).

24

Here, the ALJ rejected the opinion of the plaintiff's treating physician and gave significant weight to the opinions of non-examining physicians who did not have the benefit of Dr. Tankersley's evaluation and resulting opinion, which is largely consistent with the opinion of the plaintiff's long-term treating physician. Additionally, all three of the State agency physicians opined that the plaintiff could do light work with certain postural limitations, which is inconsistent with the ALJ's own RFC finding that the plaintiff could do only sedentary work (Tr. 28). Based upon the foregoing, the undersigned cannot say that the ALJ's decision is based upon substantial evidence. Accordingly, it is recommended that the case be remanded for further consideration. As the court did in *Rogers*, the undersigned recommends that the Commissioner be directed to submit the subsequent opinions from treating and examining sources, including the evidence discussed below that was made part of the record by the Appeals Council, to the nonexamining sources for further consideration.

### Appeals Council

As noted above, the plaintiff submitted the following evidence to the Appeals Council: 1) A questionnaire completed by Dr. Kooistra, dated July 31, 2013 (Tr. 629); 2) A December 2013 lumbar spine MRI (Tr. 630); and 3) A statement from Dr. DeGarmo dated May 5, 2014 (Tr. 632-33). The Appeals Council denied review, finding that the evidence did not provide a basis for changing the ALJ's decision (Tr. 1-3). The Appeals Council incorporated the evidence into the record (Tr. 4).

The plaintiff relies on *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), arguing that the new evidence certainly might have affected the ALJ's decision (pl. brief at 31-36). In light of the court's recommendation that this matter be remanded for further consideration of the opinions of Drs. DeGarmo and Tankersley, the undersigned further recommends that the ALJ be instructed to consider the above evidence, which the Appeals Council made part of the record.

## CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

October 8, 2015
Greenville, South Carolina